**MOBIL OIL CORPORATION,**
**Plaintiff-Appellee,**

v.

**DEPARTMENT OF ENERGY and Charles W. Duncan, Jr., Secretary of Energy, Defendants-Appellants.**

**No. 5–36.**

Temporary Emergency Court of Appeals.

Argued Sept. 28, 1979.

Decided Nov. 19, 1979.

Thomas P. Humphrey, II, Washington, D.C., with whom Sandra K. Webb and Geraldine O'Donnell, Dept. of Energy, Stuart E. Schiffer, Acting Asst. Atty. Gen., Dennis G. Linder, C. Max Vassanelli and Sheila Lieber, Dept. of Justice, Washington, D.C., were on the brief for defendants-appellants.

Thomas R. Trowbridge, III, New York City, with whom Daniel Bukovac, Donovan, Leisure, Newton & Irvine, New York City and Andrew J. Kilcarr, Donovan, Leisure, Newton & Irvine, Washington, D.C., Charles S. Lindberg and William C. Streets, Mobil Oil Corp., New York City and John G. Tucker, Orgain, Bell & Tucker, Beaumont, Tex., were on the brief for plaintiff-appellee.

Before INGRAHAM, MORGAN and GEWIN, Judges.

INGRAHAM, Judge.

This appeal by the defendant Department of Energy (DOE) arises from a decision of the district court that an April 30, 1974 amendment to the Mandatory Petroleum Price Regulations in Subpart E of Title 10 of the Code of Federal Regulations is null and void.[1] Having traversed all the prescribed avenues for administrative relief, and finding each one a cul-de-sac, the plaintiff Mobil Oil Corporation brought this action in the district court challenging the validity of the amendment. The case was submitted on cross-motions for summary judgment. On January 31, 1979 the district court denied defendant DOE's motion for summary judgment and granted plaintiff Mobil Oil's motion for summary judgment. The court entered its findings of fact and conclusions of law, which findings supported Mobil's contentions in all respects. The DOE properly perfected its appeal to this court. For the reasons set out below we affirm the judgment of the district court with modification.

Mobil Oil Corporation, one of the nation's largest refiners of petroleum products, utilizes a secondary refining process involving the use of "coker units," the effect of which is to increase by as much as 20% the refinery yield of gasoline and distillates. However, a necessary consequence of Mobil's use of this process is that Mobil also produces a very substantial quantity of petroleum coke, the solid residue of the process.

Petroleum coke produced at the refinery level consists of two different grades, one of which, because of its high sulphur content, has experienced a market decline in recent years due to increasing environmental concerns. It comes as no surprise that the bulk of Mobil's petroleum coke is of this high sulphur grade.

The controversy surrounds the April 30, 1974 amendment to the Mandatory Petroleum Price Regulations found in Subpart E of Title 10 of the Code of Federal Regulations, the effect of which was to require that all

---

1. The regulation in this case was first issued by the Cost of Living Council under authority granted by the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note. With the enactment in 1973 of the Emergency Petroleum Allocation Act, 15 U.S.C. § 751, et seq., the Federal Energy Office acquired the responsibility for administering the regulation. Subsequently, the FEO republished and renumbered the regulations without making any substantive changes. 39 Fed.Reg. 1924 (1974). After the enactment of the Federal Energy Administration Act, 15 U.S.C. § 761, et seq., the Federal Energy Administration (FEA) became responsible for administering the regulations. The FEA became part of the Department of Energy (DOE) on October 1, 1977. 42 U.S.C. § 7151(a); Executive Order No. 12009, 42 Fed.Reg. 46267 (1977). Throughout this opinion the original defendants and their successors will be referred to as the DOE.

products refined from crude oil, including those products newly exempted from regulation by the expiration on April 30, 1974 of the Economic Stabilization Act (ESA), 12 U.S.C. § 1904 note, bear their pro rata share of the refiner's increased crude oil costs. Among the exempted products after April 30, 1974 was petroleum coke; however, gasoline and distillates remained among the covered products under the successor statute, the Emergency Petroleum Allocation Act (EPAA), 15 U.S.C. § 751, *et seq.* The operation of this amendment prevented Mobil from allocating any of its increased costs of crude oil to its covered products in any greater proportion than the volume of crude oil attributable to each of those products.

The relevant portion of the pricing formula that was affected by the amendment is referred to in the industry as the V factor. Created under the old Cost of Living Council (CLC) regulations, which were promulgated under the authority of the ESA, this factor was expressed as a fraction, the numerator of which was the total volume of a particular product or products category sold in a specified time period and the denominator of which was the total volume of all covered products sold in that same time period. On December 13, 1973, the V factor was carried over from the old CLC regulations to the successor regulations issued by the Federal Energy Office pursuant to the newly enacted EPAA, 15 U.S.C. § 751, *et seq.* The new regulations in large part merely recodified and renumbered the old CLC regulations applicable to refiners as 10 C.F.R. § 212.81, *et seq. See* 38 Fed.Reg. 34414 (1973).

Under the CLC cost apportionment scheme, product categories were designated as either "special products," which included gasoline, No. 2 diesel fuel and No. 2 heating oil, or "covered products other than special products," which consisted of all other products. Thus, all products refined from crude oil were regulated under the ESA.

The regulations specifically prohibited refiners from allocating any increased costs attributable to "covered products other than special products" to "special products." In other words, each "special product" could bear only its proportionate share by volume of crude oil costs. 6 C.F.R. § 356(c)(1)(i). Among "covered products other than special products," however, a refiner was permitted to apportion increased product costs in any manner it deemed appropriate. *Id.* § 356(v)(1)(ii).

The enactment of the EPAA brought a change to the CLC apportionment scheme. That legislation required the allocation and pricing of "all crude oil, residual fuel oil, and refined petroleum products." 15 U.S.C. § 753(a). Significantly, refined petroleum products were defined as "gasoline, kerosene, distillates (including Number 2 fuel oil), LPG, refined lubricating oils, or diesel fuel." *Id.* § 752(5). The EPAA thus exempted from regulation certain products previously regulated under the ESA, namely petroleum coke, petroleum wax, asphalt, road oil and refinery gas; in other words, refinery residue.

On April 3, 1974, in anticipation of the expiration of the ESA on April 30th, 1974, the DOE amended its regulations to exempt the products not covered by the EPAA from the coverage provisions of the agency's regulations.[2] At this time, just prior to April 30, 1974, the denominator of the V factor in the cost apportionment formula continued to refer to the total volume of "covered products" sold. Basically, as before, all increased products cost could be passed through in the prices of covered products. However, not all products were "covered products" anymore and therefore increased costs attributable to these exempt products could be passed through in the prices of covered products. The DOE, believing that the EPAA did not permit such action, reacted by promulgating on April 30, 1974 the amendment at issue in this case.[3] Anxious to change the V factor before the ESA expired at midnight on April

---

2. 39 Fed.Reg. 12353 (1974) (codified at 10 C.F.R. §§ 210.34 and 212.31).

3. 39 Fed.Reg. 15139 (1974) (codified at 10 C.F.R. § 212.83(c)(2)).

30, 1974, and believing that an emergency situation existed, the DOE promulgated the amendment without any prior notice to interested parties or any opportunity for them to comment.

The amendment changed the denominator of the V factor in relevant part from "the total volume of all covered products sold" to "the total volume of all covered products and all products refined from crude petroleum other than covered products . . . ." 10 C.F.R. § 212.83(c)(2). Thus, the effect of the amendment was to preclude Mobil from apportioning any increased crude oil costs attributable to the exempt products, *inter alia* petroleum coke, to the prices of its covered products.

Mobil predicted that it would not be able to recover all of its costs in the prices of its high sulphur grade petroleum coke.[4] Therefore, on June 5, 1974, Mobil filed with the DOE a request for exception relief from the operation of the regulation. Such request was denied on the grounds that Mobil had suffered neither serious hardship nor gross inequity, one of which was necessary for relief. Subsequently another refiner whose situation was nearly identical to Mobil's was granted exception relief.[5] Mobil then applied for exception relief again, based on the grant of relief to the other refiner, and again relief was denied. The reasons offered by the DOE for its denial of Mobil's second request for exception relief were identical to its reasons given in Mobil's earlier denial of relief. The DOE opined that Mobil's case was substantially different from the other refiner's case.

Mobil, having thus exhausted all its administrative remedies, brought this action in the district court seeking declaratory relief. Mobil alleged primarily that the DOE's action in promulgating the amendment was arbitrary and capricious, in excess of the agency's statutory authority and an abuse of discretion. Mobil alleged also that the agency's two separate denials of exception relief were arbitrary and capri-

cious, an abuse of discretion and unsupported by substantial evidence. The DOE answered, denying virtually every allegation. Mobil later amended its complaint to allege that the amendment had been promulgated in violation of the notice and comment provisions of § 4 of the Administrative Procedures Act (APA), 5 U.S.C. § 553.

Following extensive discovery, both parties moved for summary judgment. After written and oral arguments, the district court granted Mobil's summary judgment motion and denied the DOE's, finding the April 30, 1974 amendment to the Mandatory Petroleum Price Regulations to be both substantively and procedurally invalid. The court also found that the DOE's denial on both occasions of Mobil's requests for exception relief was arbitrary and capricious and not supported by substantial evidence.

There are three questions presented for review in this appeal. We are asked to decide whether the agency action in promulgating the amendment of 10 C.F.R. § 212.83(c)(2) on April 30, 1974 was arbitrary, capricious and beyond the authority conferred by the EPAA, 15 U.S.C. § 751, *et seq.*; secondly, whether the amendment was improperly promulgated without compliance with the provisions of § 4 of the APA, 5 U.S.C. § 553; and finally, whether the DOE's denials of exception relief were within its authority and supported by substantial evidence. Our decision today is based narrowly upon affirmative answers to the first two questions. We need not reach the third question and we therefore decline to decide it.

The scope of our judicial review has been restated so often that further elaboration is unnecessary. We must simply determine under the guidelines set forth in § 211(d)(1) of the ESA, 12 U.S.C. § 1904 note, which by virtue of § 5(a)(1) of the EPAA, 15 U.S.C. § 754(a)(1) governs our review here, whether there was substantial evidence in the record to support the findings of the district court that the promulgation of the amend-

---

4. The record reveals that Mobil's prediction was correct, since the losses in 1974 and 1975 alone amounted to over $75,000,000.

5. *Getty Oil Co.*, 2 FEA ¶ 83,231 (Aug. 4, 1975).

ment was in excess of the DOE's authority, was arbitrary and capricious or was otherwise unlawful under the Act. *Grigsby v. Department of Energy*, 585 F.2d 1069, 1074 (Em.App.1978), *cert. denied*, 404 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979); *Texaco, Inc. v. FEA*, 531 F.2d 1071, 1076 (Em. App.1976), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).

The DOE maintains that the district court applied an erroneous standard of review of action alleged to be arbitrary and capricious. It argues that judicial review of agency action is limited to a determination of whether the challenged action has a rational basis. In support of its position the DOE quotes language in *Pacific Coast Meat Jobbers Ass'n v. Cost of Living Council*, 481 F.2d 1388 (Em.App.1975), affirming that the " 'judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.' " *Id.* at 1391, *quoting Mississippi Valley Barge Co. v. United States*, 292 U.S. 282, 286–87, 54 S.Ct. 692, 78 L.Ed. 1260 (1934). Furthermore, maintains the DOE, in applying this rational basis test, great deference is to be accorded the actions and decisions of the administrative agency.

■ The flaw in this argument stems from the agency's misconception of the applicable test. The standard of review of agency action alleged to be arbitrary and capricious is not simply whether there exists a rational basis for the action. Rather, as noted in *Texaco, Inc. v. FEA, supra*, the inquiry is "whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for the conclusions approved by the administrative body." 531 F.2d at 1076–77; *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285,

95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The enumeration by the *Texaco* court of the three elements in the conjunctive negates any implication that the rational basis test alone can suffice. The district court did not apply an erroneous standard of review.

■ Both parties agree that the factors set out in § 4(b) of the EPAA, 15 U.S.C. § 753(b)(1), were relevant to the agency's decision.[6] No single factor is inherently more important than any of the other factors. Instead, as this court has held, all nine factors are to be balanced objectively. *Pasco, Inc. v. FEA*, 525 F.2d 1391, 1397 (Em.App.1975); *Air Transport Ass'n of America v. Federal Energy Office*, 520 F.2d 1339, 1342 (Em.App.1975); *Consumers Union v. Sawhill*, 525 F.2d 1068, 1079 (Em.App. 1975) (*en banc*). The statute provides that the agency action shall attempt to achieve those objectives "to the maximum extent practicable." 15 U.S.C. § 753(b)(1).

The disagreement lies in whether or not the agency was required to consider those factors prior to its promulgation of the amendment. We have already noted that the proper test includes a consideration of the relevant factors. *See Texaco, Inc. v. FEA, supra*, 531 F.2d at 1076–77. However, the DOE claims that since the amendment arguably fosters certain of the objectives, then the district court erred when it held the amendment invalid based upon the agency's failure to consider those objectives sufficiently.

It is clear from the record that at no time prior to promulgating the April 30, 1974 amendment did the DOE even consider the relevant factors or objectives set out in § 753(b)(1). The agency admitted that it chose to adopt the volumetric apportion-

---

**6.** Some of the factors considered pertinent by both parties include:

    (D) preservation of an economically sound and competitive petroleum industry . . .;

       *       *       *       *       *       *

    (F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices . . .;

     *       *       *       *       *       *

    (H) economic efficiency; and

    (I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

15 U.S.C. § 753(b)(1).

ment scheme of cost allocation solely because that was the only method set forth in the regulations at that time. Additionally, the agency confessed that the sole purpose of the amendment was to conform the regulations to the expiration of the ESA, notwithstanding the EPAA requirement that the purpose of the regulations be to achieve those nine EPAA objectives to the maximum extent practicable.

■ It is therefore readily apparent to us that the agency neglected to fulfill its statutory command when it promulgated the amendment without considering the Act's objectives. As such, the DOE's action was beyond its statutory authority. *See Texaco, Inc. v. FEA, supra,* 531 F.2d at 1076–77. *See also Nader v. Sawhill,* 514 F.2d 1064, 1067 (Em.App.1975). *Pacific Coast Meat Jobbers Ass'n v. Cost of Living Council, supra,* on which the agency relies for its support, even notes that the district court "found that the defendant CLC *did consider all the factors involved* and the potential side effects of its action, and made a rational judgment in determining to act as it did." 481 F.2d at 1392 (emphasis added). From this, it may be inferred that the balancing of objectives which is required of the agency under *Consumers Union v. Sawhill, supra,* could not have occurred absent consideration of the objectives of the Act *before* promulgation of the amendment. Thus, the district court did not err when it found the promulgation of the amendment to be arbitrary and capricious and beyond the statutory authority of the agency under the EPAA.[7]

■ We next confront the DOE's argument that the challenged amendment conformed with the provisions of § 4 of the APA, 5 U.S.C. § 553, which is incorporated by reference in § 5(a)(1) of the EPAA, 15 U.S.C. § 754(a)(1). This section provides for notice of proposed rulemaking by the agency and affords interested persons an opportunity to comment on and participate in the

agency rulemaking. The April 30, 1974 amendment required inclusion within the V factor of the pricing formula the sales volumes of exempt products, including petroleum coke. Under the CLC regulations in force prior to the April 30, 1974 amendment, refiners were permitted to allocate increased costs for "covered products other than special products," which category included petroleum coke, in any manner they deemed appropriate. It seems clear, therefore, that substantively the April 30, 1974 amendment altered the price regulation framework and the informal rulemaking accompanying the procedure was subject to the notice and comment standard.

■ The agency contends that its procedure satisfied an exception contained in the statute. Although the APA generally requires that during the course of an informal rulemaking interested parties be given notice and an opportunity for comment, § 553 provides that those requirements do not apply

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or (B) when the agency for good cause finds (and incorporates the finding in a brief statement of reason therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

5 U.S.C. § 553(b).

The DOE argues that it made and published a finding of good cause for dispensing with normal notice and comment requirements, thus clearing the procedural hurdle. Upon promulgation of the challenged amendment, the agency incorporated therein its statement that:

Because the purpose of these amendments is to provide immediate guidance and information with respect to the mandatory petroleum price rules and regulations which apply to refiner's permissible prices in the month of May, the Federal

---

7. The district court also found that the amendment violated the dollar for dollar pass through provision of § 4(b)(2) of the EPAA, 15 U.S.C. § 753(b)(2). The grounds for our decision do not require resolution of that issue. Accordingly, we express no opinion on the district court's finding with respect to that point.

Energy Office finds that normal rule-making procedure is impracticable and that good cause exists for making these amendments effective in less than 30 days.

39 Fed.Reg. 15139 (1974). The DOE submits that this finding constituted good cause.[8]

It is axiomatic that a mere recital of good cause does not create good cause. Similarly, a desire to provide immediate guidance, without more, does not suffice for good cause. In *Nader v. Sawhill, supra,* the court noted that if the "conclusory statement that normal procedures were not followed because of the need 'to provide immediate guidance and information . . . constitutes 'good cause,' then an exception to the notice requirement would be created that would swallow the rule.'" 514 F.2d at 1068 (citation omitted).

▮ The only other justification offered by the agency for its good cause finding appears to be that an emergency condition existed. More specifically, the rapidly approaching date of expiration of the ESA coupled with the agency's oversight regarding the effect of the expiration on the pricing formula provided the good cause necessary for dispensing with notice and comment. As the district court noted, the expiration of the ESA extinguished the agency's authority to regulate certain by-products of the refining process such as petroleum coke; however, it did not require the agency to amend its cost allocation formula. The ESA's expiration therefore could not serve as a basis for a finding of good cause to dispense with the notice and comment requirements. *Shell Oil Co. v. FEA,* 527 F.2d 1243 (Em.App.1975), rejects the DOE's justification:

The record clearly shows that good cause for avoiding compliance with the requirements of the Administrative Procedure Act did not exist in this case. The expiration of the Stabilization Act was not so unexpected as would have precluded advance notice by the FEA of its own proposed regulations for controlling rents and accepting comments thereon prior to April 30, 1974.

*Id.* at 1248. *See also United Steel Corp. v. Environmental Protection Agency,* 595 F.2d 207 (5th Cir. 1979) (argument that statutory deadlines made prior notice and comment impracticable and contrary to the public interest rejected); *Sharon Steel Corp. v. Environmental Protection Agency,* 597 F.2d 377 (3d Cir. 1979) (mere existence of deadlines for agency action, whether set by statute or court order, does not in itself constitute good cause for dispensing with notice and comment).

▮ The agency alternatively claims *post hoc* that the April 30, 1974 amendment was an interpretative ruling and therefore, under 5 U.S.C. § 553(b)(A), exempt from notice and comment requirements. If the DOE had concluded that either its statutory authority or the existing regulations were in need of clarification by way of an interpretative ruling, then it would have had no reason to incorporate a finding of good cause.

The agency attempts to generalize this argument by pointing out that in reality the April 30, 1974 amendment did nothing more than interpret the regulations as they existed prior to the April 3, 1974 amendment. However, it is clear that the April 3, 1974 amendment exempted products not covered by the EPAA. Thus, any "interpretation" of regulations concerning cost apportionment among those exempted prod-

---

**8.** The DOE relies on *National Helium Corp. v. FEA,* 569 F.2d 1137 (Em.App.1977). In *National Helium* the court reviewed the events surrounding the passage of the EPAA and the expiration of the ESA and concluded that good cause did in fact exist for the DOE's promulgation of the April 3, 1974 amendment, regarding the statutory classification of various products as "covered products," without notice or opportunity to comment. That case involved es-

sentially the same statement of good cause as was used by the DOE herein. However, the court's observation that "[n]otably the FEO *made no substantive changes in the price regulation framework* it had adopted on January 15 . . . ," *id.* at 1142 (emphasis added), expresses the distinction between *National Helium* and the present case. Here there was definitely a substantive change in the price regulation framework. *See id.* at 1146 n.19.

ucts prior to their exemption from the Act's coverage is irrelevant. The agency's argument is meritless. Therefore, the district court did not err when it found that the April 30, 1974 amendment did not interpret the agency's statutory authority or its regulations.

The DOE's reliance on *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), for the proposition that the court is imposing on it a more stringent procedural requirement than Congress mandated in the APA is misplaced. We do not impose here any additional requirement; we merely intimate that the agency failed to satisfy the specific statutory directive that notice and an opportunity for comment accompany the rulemaking absent the existence of one of the exceptions. Our duty is to scrutinize the record to ascertain whether in fact an exception did exist. As was noted in *Vermont Yankee*:

In short, nothing in the APA, NEPA, the circumstances of this case, the nature of the issues being considered, past agency practice, or the statutory mandate under which the Commission operates permitted the court to review and overturn the rulemaking proceeding on the basis of the procedural devices employed (or not employed) by the Commission so long as the Commission employed at least the statutory *minima* . . . . .

*Id.* at 548, 98 S.Ct. at 1214, 55 L.Ed.2d at 482.

■ In sum, since none of the reasons advanced by the agency support a finding of good cause, and since the amendment cannot be considered an interpretative ruling, the district court did not err when it found the April 30, 1974 amendment of 10

C.F.R. § 212.83(c)(2) null and void as having been promulgated in violation of the notice and comment provision of the APA.[9]

The DOE also challenges the district court finding with respect to the denials of exception relief. The district court found that since the agency had granted identical exception relief to another refiner, which relief consisted of allocating to covered products those increased product costs arguably attributable to petroleum coke, then the agency's denial of Mobil's second request for exception relief was arbitrary and capricious, in excess of the agency's statutory authority and unsupported by substantial evidence. This finding, insists the agency, was error. Since we have already determined for other reasons that the challenged amendment was never validly promulgated, either substantively or procedurally, we assume, without deciding, that Mobil is in need of no exception relief from the operation of the amendment.

■ We note here that although the principal issue in this case is the validity of the April 30, 1974 amendment, it must be pointed out also that the district court judgment in holding the amendment invalid and permitting Mobil to allocate increased costs associated with exempt products to covered products apparently entitles Mobil to reallocate costs continuously from April 1974 up to the present. The agency alleges that this is incorrect.[10] We agree.

In December 1975, Congress enacted the Energy Policy and Conservation Act, Pub. L.No. 94–163, 89 Stat. 871 (codified in scattered sections of 5, 10, 15, 30, 42, 50 U.S.C.). That Act amended § 4(b)(2) of the EPAA, 15 U.S.C. § 753(b)(2), to provide in pertinent part that the regulations, in specifying

---

**9.** The DOE stresses the fact that subsequent rulemakings (concerning modification of the V factor and other allocation and cost formulas) were conducted with notice and comment, thus supporting its position that the V factor as modified by the April 30, 1974 amendment ought to be upheld. But if the agency deemed all those V factor rulemakings of a type that necessitated notice and comment, surely the April 30, 1974 rulemaking required no less. Moreover, the opportunity to comment after

promulgation cannot substitute for notice and an opportunity to comment beforehand.

**10.** Mobil, during the pendency of this appeal, filed a Motion to Strike certain portions of the agency's appellate brief and appendix, alleging that factual and legal matters not raised below were asserted initially on appeal to this court. We will decide the case on its merits and judicially notice the relevant statutes.

prices or the manner in which prices are determined, "shall not permit more than a direct proportionate distribution (by volume) to Number 2 oils (Number 2 heating oil and Number 2–B diesel fuel), aviation fuel of a kerosene or naphtha type, and propane produced from crude oil, of any increased costs of crude oil incurred by a refiner . . . ." *Id.* § 753(b)(2)(D).

The argument is as follows: As of February 1, 1976, the effective date of the statutory amendment, the agency was prohibited from authorizing pass through of increased product costs to prices of specified products in any greater amount than a directly proportionate amount by volume. Since the effect of the district court judgment is to allow the pass through to *any covered products,* including those products specifically restricted by § 4(b)(2)(D) without any limitation on proportions by volume, then the percentage of total costs allocated to the specified products might be greater than a proportionate amount by volume. Thus, the judgment contravenes the statutory directive.

It may be argued, on the other hand, that so long as Mobil does not allocate increased product costs to those specified products in any greater amount than statutorily authorized, then the judgment does not conflict with the statute. However, we believe the decisive point is that the judgment permits unrestricted cost pass through to the specified products in a manner which might re-

sult in a greater than proportionate allocation by volume. For that reason alone, the judgment must be modified.[11] Accordingly, the case must be remanded to the district court for findings consistent with the foregoing comments.

In conclusion, we find that the district court did not err when it found the challenged amendment to the Mandatory Petroleum Price Regulations, 10 C.F.R. § 212.-83(c)(2), promulgated on April 30, 1974 null and void as being arbitrary and capricious and beyond the agency's authority. Likewise, the district court did not err when it found that the agency did not comply with the requirements of § 4 of the APA, 5 U.S.C. § 553, thus rendering the amendment procedurally invalid. For the reasons discussed above, we do not decide the issue of whether the agency's denials of exception relief were arbitrary and capricious and unsupported by substantial evidence. Based solely upon the above narrow grounds the judgment is affirmed as modified.

AFFIRMED IN PART and REMANDED FOR FURTHER FINDINGS.

---

11. The agency contends that a subsequent rulemaking in September 1974, concerning non-product cost pass through, also cures any defect in the April 30, 1974 amendment, since Mobil was given notice and an opportunity to comment at that time. However, Mobil's opportunity to comment in a subsequent rulemaking involving *non-product* cost pass through in no way substitutes for its right to comment in the prior *product* cost pass through rulemak-

ing. Furthermore, the receipt of comments after promulgation cannot cure prior rulemaking defects. Consequently, the judgment was not incorrect insofar as it permitted to Mobil to allocate exempt product costs to covered products during the period of time between the September 19, 1974 rulemaking and the February 1, 1976 effective date of the congressional amendment to the EPAA.